UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO:


THE HOLLYWOOD BEACH RESORT
RENTAL PROGRAM, LLC

                         Plaintiff

  v.

MICHAEL JEKIC

LAURA WELLIVER

CHRISTINA MORELLO

MARIA MEJIDO

JUDY BUCHAN

ANDREW FISHER

COMMERCIAL UNIT 100, LLC

COMMERCIAL UNTI 200, LLC

OCEAN WALK MALL, LLC

OCEAN HOLLYWOOD BEACH DEVELOPMENT, LLC

JOHN DOES 1-10

JANE DOES 1-10

                         Defendants

_____/

**COMPLAINT WITH JURY DEMAND**

1

COMES NOW Plaintiff, The Hollywood Beach Resort Rental Program, LLC (hereinafter

referred to as "Plaintiff"), by and through the undersigned counsel, and in accordance with the applicable Federal Rules of Civil Procedure, hereby files this Complaint and sues Defendants Michael Jekic, Laura Welliver, Christina Morello, Maria Mejido, Judy Buchan, Andrew Fisher, Commercial Unit 100, LLC, Commercial Unit 200, LLC, Ocean Walk Mall, LLC, Ocean Hollywood Beach Development, LLC, John Does 1-10 and Jane Does 1-10 (the aforesaid Defendants are also hereinafter collectively referred to as "Defendants"), and alleges as follows:

## SUMMARY OF THE CASE

1. This is principally a Civil RICO mail/wire fraud case in which the Defendants conspired to defraud and defrauded one thousand plus residential condominium unit owners and time-share owners, who own condominium units and time-share units at the "Hollywood Beach Resort," located in Hollywood, Florida, by entering into business transactions which are unlawful and misrepresenting the facts and failing to disclose material facts regarding those transactions when there was a duty to disclose; by further actively concealing their unlawful business transactions and conspiracy by holding secret, closed door meetings which were required to be open to all Unit Owners; and by wrongfully misappropriating association funds and concealing the same with false accounting records and with false representations and omissions of material fact.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1964(c) (Civil Rico), as claims are being brought against Defendants pursuant to 18 U.S.C. §1962. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367, as these claims are intricately related to Plaintiff's RICO claim and form a part

of the same case or controversy.

3.   Venue is proper in this judicial district pursuant to 18 U.S.C. §1965 and §1391, because Defendants reside in this district, Defendants transacted their affairs in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and/or the property which is the subject of this lawsuit is located in this district. Further, Defendants are subject to personal jurisdiction in this district.

## THE HOLLYWOOD BEACH RESORT PROPERTY

4.   The "Hollywood Beach Resort" is a historic resort property located on the historic Hollywood Beach Boardwalk, at 101 North Ocean Drive, Hollywood, Florida 33019 (hereinafter, the "Hollywood Beach Resort").

5.   There are approximately 360 residential condominium unit owners and 1,976 time-share owners (hereinafter, collectively "Residential Unit Owners") at the Hollywood Beach Resort, which typically rent their units to transient guests. The original purpose and intent behind the development of the Hollywood Beach Resort was to allow families who otherwise may not be able to afford a residence on the ocean in South Florida, to be able to afford a unit by renting to transient guests at the Hollywood Beach Resort.

6.   There are also two commercial condominium units, which have a mall like appearance with various spaces available for rent to tenants for commercial retail, office and restaurant uses, located on two separate floors at the Hollywood Beach Resort. These commercial condominium units are known as "Commercial Unit 100" (located on the first floor) and "Commercial Unit 200" (located on the second floor) of the Hollywood Beach Resort (hereinafter referred to respectively as "Commercial Unit 100" and "Commercial Unit 200").

3

7.   Because of the mixed use of the Hollywood Beach Resort, there is a "master association," which is responsible for the operation, maintenance and management of the

common elements, and for the issuance of assessments to pay for the same.

8.   Hollywood Beach Hotel Owners Association, Inc. is the "master association (hereinafter, the "Master Association"), and is a Florida not-for-profit corporation, with a principal place of business at 101 N. Ocean Drive, #8, Hollywood, Florida 33019 (See Condominium Documents, Exhibit A hereto).

9.   The Master Association serves both as a condominium "Association," as defined by Fla. Stat. § 718.103(2), and as a timeshare "Owners' Association," as defined by 721.05(27), for the Hollywood Beach Resort.

10.   Hollywood Beach Resort Condominium Association, Inc. (hereinafter, the "Association"), is a Florida not-for-profit corporation, with a principal place of business at 101 N. Ocean Drive, #8, Hollywood, Florida 33019, whose members are limited to the owners of condominium residential units and condominium commercial units located at the Hollywood Beach Resort (the Association and Master Association are sometimes referred to Collectively, as "Both Associations") (See Condominium Documents, Exhibit B hereto).

11.   The Association is not responsible for the operation, maintenance and issuance of any assessments regarding the common elements and facilities at the Hollywood Beach Resort, as that right and obligation is reserved and belongs exclusively to the Master Association.

12.   The owners of the aforesaid two commercial units are subject to the same obligations to pay assessments as are the Residential Unit Owners.

13.   The members of the Association are also members of the Master Association.

4

14. The owners of the time-share units are also members of Master Association.

15. While there is technically a board of directors for each association, the directors are usually identical for each board.

## THE PARTIES

16. From January 2012 to present, Defendants Michael Jekic ("Jekic"), Laura Welliver ("Welliver"), Christina Morello ("Morello"), Maria Mejido ("Mejido") Andre Weisbrod ("Weisbrod") Judy Buchan ("Buchan") ("Frank Cresci") and Andrew Fisher ("Fisher") served at various times on the board of directors of the Master Association and the Association (sometimes referred to as, "Board Members").

17. From January, 2011 to present, Jekic served as the President and Welliver served as the Vice-President of the Master Association and the Association, respectively.

18. Plaintiff Hollywood Beach Resort Rental Program, LLC (the "Plaintiff") is an owner of condominium unit number 563 at the Hollywood Beach Resort, having acquired title from South Coastal Properties, Inc., an affiliate entity, and is an assignee of all of all right, title and interest in any and all claims that South Coastal Properties, Inc. (the "Assignee") has against all Defendants in this lawsuit, including the claims being brought in the instant lawsuit. As an owner of a condominium unit, Plaintiff is a member of the Master Association and the Association.

19. From October 1997 to September 26, 2011, Defendant Ocean Walk Mall, LLC ("Ocean Walk") owned the aforesaid two commercial condominium units at the Hollywood Beach Resort, "Commercial Unit 100" and "Commercial Unit 200."

20. From October 1997 to present, Ocean Walk also owned real property which abuts the Hollywood Beach Resort on the ocean, board walk side, which includes a bar area and pool

(hereinafter, the "Bar/Pool Property"). This Bar/Pool Property is not condominium property within the meaning of Fla. Stat. § 718.103(13), and is separate and apart from the real estate which makes up the Hollywood Beach Resort, although the Master Association, Association and Unit Owners have certain use rights pursuant to an easement agreement.

21.     On September 26, 2011, Commercial Unit 100, LLC (the "CU100 LLC"), and Commercial Unit 200, LLC (the "CU200 LLC"), became owners of Commercial Unit 100 and Commercial Unit 200, respectively. Their deeds recited that they were transferred to affiliate entities with no documentary stamps due and the consideration listed on the property appraiser's web site was $100.00 for each.

22.   On or about November 5, 2013, Defendant Ocean Hollywood Beach Development, LLC, became the owner of Commercial Unit 200.

## THE CONSPIRACY

23.   Given that the Bar/Pool Property is contiguous to the Atlantic Ocean and the Hollywood Beach Boardwalk, it is extremely valuable real estate.

24.     At the same time, there is an area that is part of Commercial Unit 100 commonly known as the "front desk" and "office" (hereinafter, "front desk/office area"), which has been used over the years by various tenants to operate a hotel rental program regarding the residential units.

25.  Commercial Unit 100 is more valuable than Commercial Unit 200 for several reasons, including, but not limited to, its location on the first floor.

26.     Prior to 2010, there had been attempts by large developers to take over the entire Hollywood Beach Resort, which would require buying out all of Residential Unit Owners, in order to redevelop the Hollywood Beach Resort into a large resort hotel complex with one owner.

Plaintiff's managing member, Richard Schecher, had been on the Board of Directors of Both Associations when a large developer approached the unit owners at the Hollywood Beach Resort with such a redevelopment project, and when unit owners expressed overwhelming opposition, Richard Schecher successfully championed the defeat of the proposal. While his

efforts saved thousands of families who owned residential units from losing their investment and their dreams of owning a piece of paradise, it made him unpopular with those who were in favor of selling out to developers.

27.   Starting in December 2010, the efforts to sell out to developers arose again, when Defendants Michael Jekic, Laura Welliver, Christina Morello, Judy Buchan, and Maria Mejido began plotting a fraudulent scheme to take over control of the board for Both Associations, in order to bankrupt Both Associations and diminish the economic value and viability of individual residential units, for the purpose of facilitating the acquisition of the entire Hollywood Beach Resort, including the Residential Units, by a large developer.

28.   As of September 2011, Defendants Michael Jekic, Laura Welliver, Christina Morello, Judy Buchan, and Maria Mejido had become Board Members of Both Associations (hereinafter the "Defendant Board Members"), and in order to further accomplish their fraudulent scheme, they devised the following specific plan: a) to remove the existing tenants from the leasehold space in the Bar/Pool Property and front desk/office area (owned by Ocean Walk at the time), and take control of the Bar/Pool Property and front desk/office area by leasing the space to operate their own restaurant/bar business and hotel rental business, something that neither the Master Association or Association had ever done before because it is common knowledge in the condominium industry that associations are generally incapable of successfully operating such

7

businesses; b) to allow the Hollywood Beach Resort to fall into a state of disrepair; and c) to destroy the value of the Residential Units and the financial viability of the Master Association and Association so that residential units could be bought "on the cheap."

29.  At the same time, as of September, 2011, Ocean Walk was materially in default of its obligation to pay assessments to the Master Association for Commercial Unit 200, and owed the

Master Association in excess of $500,000.00, which eventually exceeded one million dollars, for unpaid maintenance fees and special assessments for Commercial Unit 200. This presented a problem for Ocean Walk, because it also owned the abutting Bar/Pool Property, which is extremely valuable, along with the Commercial Unit 100, which is more valuable than Commercial Unit 200, both of which had little, if any, debt, and a judgment against Ocean Walk for the unpaid assessments owed regarding Commercial Unit 200, would subject the Bar/Pool Property and Commercial Unit 100 to execution and foreclosure on a judgment lien.

30.  At the same time, in September 2011, Ocean Walk decided to implement a plan to avoid paying future assessments and special assessments at the Hollywood Beach Resort; avoid paying the $500,000.00 plus in delinquent assessments that were owed by Ocean Walk for Commercial Unit 200; shield and protect Commercial Unit 100 and the Bar/Pool Property from execution and foreclosure; and sell Commercial Unit 200 to a third party.

31.  **In order to accomplish their respective goals, the Defendant Board Members and Ocean Walk needed each other**. Thus, in September 2011, the Defendant Board Members, on the one hand, and Ocean Walk, on the other hand, entered into a conspiracy, the design, purpose and intent of which was to accomplish each of their aforesaid goals alleged in Paragraphs 27 through 30 above. To this end, they agreed to act in concert with one another that Both Associations would

8

allow Ocean Walk to transfer Commercial Unit 100 and Commercial Unit 200 to straw entities for

no consideration, and grant the new straw owners of Commercial Unit 100 and Commercial Unit

200 a rebate in special assessments in the approximate amount of 41%, without granting other

condominium owners any abatement of special assessments; and in return, Ocean Walk would

force the tenant out of its leasehold space in the Bar/Pool Property and front desk/office area, and

then lease the same to a straw entity created by the Defendant

Board Members.

32.     At the same time, Defendant Board Members and Ocean Walk agreed that they

would actively conceal their aforesaid conspiracy from Plaintiff and other Residential Unit

Owners, thought various mechanisms, which included using a straw entities to obtain title to

Commercial Unit 100 and Commercial Unit 200; by using a straw entity to operate the

bar/restaurant business and hotel rental program so that the Residential Unit Owners could be kept

in the dark even though Both Associations would be leasing the spaces; by holding "closed door"

meetings where Residential Unit Owners were not allowed to attend; by never revealing the terms

and conditions of the lease and business deals to the Residential Unit Owners or allowing them to

vote on same; and by "cooking the books" by using fraudulent entries in the financial records to

conceal their diversion of money from Both Associations to fund the new businesses.

**EVIDENCE OF THE ACTUAL IMPLEMENTATION OF THE CONSPIRACY TO DEFRAUD**

33.   In November and December, 2010, as part of the implementation of their scheme to

defraud, Defendant Board Members began falsely representing to Residential Unit Owners that the

company managing Both Associations had been fired because it had embezzled money from Both

Associations and had otherwise breached fiduciary duties – a representation which would later be proven to be totally false and baseless by an independent forensic auditor and by an investigation by the State of Florida. However, Defendant Board Members did not care and actually knew or had reason to know that the representation was false and made it with the specific intent to influence Residential Unit Owners not to question the replacement of the management company, which Defendant Board Members needed out of the way in order to

perpetrate their scheme to defraud, because the managing member of the management company was Richard Schecher – the same person who had beat back a prior takeover attempt. Said representation was further intended to influence Residential Board Members to vote for them at the upcoming 2011 board elections. Unfortunately, the audits could not be completed in time which would have revealed the truth, and a new interim board was appointed with Michael Jekic effectively in charge; Defendant Board Members were elected to a new Board in 2011; and the management company was fired, thereby creating the opportunity to further implement their fraudulent scheme.

34. Thereafter, in furtherance of the conspiracy to defraud, on September 26, 2011, Ocean Walk executed quit claim deeds transferring ownership of Commercial Unit 100 to CU100 LLC, and Commercial Unit 200 to Defendant CU200 LLC.

35. As evidence of the fraudulent nature of the transfers, CU100 LLC and CU200 LLC did not even exist as legal entities at the time of said transfers and later filed for Articles of Organization as Florida limited liabilities companies.

36. Not surprisingly, said transfers were without adequate consideration, and the transfers were to insiders and affiliates of Ocean Walk (as stated on their quit claim deeds), for the specific,

intended purpose of defrauding creditors and attempting to shield Commercial Unit 100 and the Bar/Pool Real Property from liability for the unpaid assessments owed by Ocean Walk for Commercial Unit 200, and to avoid attachment and foreclosure via a judgment lien.

37.   Thus, CU100 LLC and CU200 LLC were formed for the purpose of facilitating the aforesaid conspiracy, and joined and became part of said conspiracy beginning with their formation, continuing thereafter with their transfer of Commercial Unit 100 and Commercial Unit 200, and continuing thereafter as described more fully below.

38.   Defendant Board Members obviously knew that Ocean Walk was grossly in default of its obligation to pay assessments, and intentionally failed to make any mention of its delinquency at public board meetings or to take any action to collect the same.

39.   Defendant Board Members also knew of the aforesaid fraudulent conveyances of Commercial Unit 100 and Commercial Unit 200 by Ocean Walk, and allowed the transfers as part of the aforesaid conspiracy they entered into with the insiders and affiliates of Ocean Walk, Commercial Unit 100 and Commercial Unit 200.

40.   On August 15, 2012, Defendant Board Members, excluding Judy Buchan who was not in attendance, represented at a public board meeting of Both Associations that they were in the process of negotiating to lease from Ocean Walk, including a portion of the Bar/Pool Property and front desk/office area, which they would use to start-up a new hotel rental program and a new bar and restaurant. (See Board Minutes, Exhibit C hereto). According to the Board minutes:

> "The Association is negotiating with the mall to take over the lease for the front desk, laundry and storage area on the first floor."

> "The Association is also negotiating with the mall to take over the lease for O'Malley's restaurant and bar." (See Exhibit C). (Emphasis added).

41.  As part of their concealment, no details of the alleged lease or business terms were disclosed to the Residential Unit Owners, such as the length of the leases, the amount of rent, the funding mechanism for paying rent, income and expense projections, ect. (See Exhibit C).

42.  Despite the fact that Defendant Board Members disclosed no material terms to the Unit Owners at the Board meeting, and the fact that Defendant Board Members had specifically represented at said meeting that the lease was still in the negotiation stage, they actually voted and approved a lease at the same Board meeting, and represented that the expenses of the hotel

rental program would be paid solely from the Residential Unit Owners that participated in the rental program, and that the bar/restaurant business would be profitable enough to pay its own expenses and reduce monthly maintenance assessments paid by all unit owners - a representation that would later prove to be totally false. (See Exhibit C).

43.  By representing that they were in the process of negotiating a lease on the one hand, but then approving a lease on the other hand, Defendant Board Members were either lying to the owners and had already cut a deal in  a private meeting and were approving that deal without disclosing the material terms to the Residential Unit Owners, or they had not yet cut a deal and were authorizing themselves to enter into a lease in the future without a proper board meeting or disclosure of the material terms to the Unit Owners. Either scenario is a flagrant violation of the Residential Unit Owner's rights under the Florida statutes and condominium documents, as Fla. Stat. § 718.114 required the vote of  unit owners to lease property which was not part of the condominium property (as was the case with the Bar/Pool Property being leased) and required board meetings to be open to unit owners and the presentation of all material terms of the lease and business plans at a public board meeting.

44.   On September 13, 2012, Defendant Board Members created a new Florida Limited Liability Company, named HHBR, L.L.C. (the "HHBR").

45.   The initial manager of HHBR was Both Associations, but that was changed in 2012, and Defendant Welliver has been the sole manager since that time.

46. On October 5, 2012, in furtherance of the fraudulent scheme, Defendant Board Members, excluding Maria Mejido who was not in attendance, ex post facto voted and approved to form a new "LLC" to be named "HHBR, LLC," for the alleged purpose of operating the new hotel rental program and bar/restaurant, as part of Both Associations. (See minutes, Exhibit D

hereto).

47.   However, as additional evidence of the fraudulent scheme, Defendant Board Members had already formed said "LLC," and thus it had been previously formed without prior, proper approval of the board at a public board meeting – yet more evidence of the pre-planned fraudulent scheme.

48.   Further, HHBR was also formed as a limited liability company and not registered as a condominium association with the specific purpose and intent of further concealing the leasehold deal and financials from the Residential Unit Owners, and to avoid the application of Florida condominium laws. However, under Florida law, a Florida condominium association cannot create an entity to conceal what are really association activities and to avoid the legal safeguards in place for members of associations.  Moreover, because HHBR was, in reality, operated as part of a Florida condominium association, its creation as an limited liability company violated Fla. Stat. § 718.11(1)(a), which requires any condominium association to be formed as a corporation. The Defendant Board Members nevertheless did not care that the structure of the entity was unlawful,

as the very purpose of the entity was to perpetrate their unlawful fraudulent scheme.

49.   At the same October 5, 2012 board meeting, in furtherance of their fraudulent scheme, Defendant Board Members, excluding Maria Mejido who was not in attendance, voted and approved that the initial start-up of their new bar/restaurant would be funded with money recovered from an insurance claim, which again violated the Florida Statutes and Both Associations' Declaration and By-laws. (See Exhibit D).

50.   On October 5, 2012, in furtherance of their fraudulent scheme, Defendant Board Members caused Both Associations and HHBR to execute a written Lease with Ocean Walk (the

"Lease"), excluding Maria Mejido who was not in attendance but had previously approved the lease. Under the lease, Both Associations agreed to pay $7,500,000.00 in rent to Ocean Walk, and to guaranty the same with the individual units of the Residential Unit Owners, thus placing their condominium and hotel units in financial peril, which was the goal of their fraudulent scheme. (See lease, Exhibit E hereto). Defendant Board Members entered into the Lease without doing any due diligence, financial break-even analysis or developing business plan - further evidence of the fraudulent intent of the lease deal.

51.   **To this day, the Residential Unit Owners have <u>never</u> been informed of the terms and conditions of said lease**, which Defendant Board Members have intentionally done to further conceal their fraud, although there was a legal duty to disclose the same to Residential Unit Owners. Moreover, in furtherance of the fraud by Defendant Board Members, Residential Unit Owners have never been allowed to vote on whether to approve any such lease deal or the start-up businesses. Thus, not only did Defendant Board Members violate the laws requiring public board meetings and the disclosure of the terms and conditions to Unit Owners, they violated Fla. Stat. §'s

718.103, 718.111, 718.113, and specifically, 718.114, which require any agreement to acquire leaseholds or other possessory or use interests in lands that are not part of the condominium property to be approved <u>by a majority of the unit owners</u>. The approval of the lease by the Board of Both Associations, without ever obtaining the vote and approval of the Unit Owners, also violated Both Associations' Declaration and By-laws and Florida statutory law.

52.     This "closed door" lease deal further specifically violated Fla. Stat. §'s 718.111, 718.112, 718.113, 718.114, because Defendant Board Members:

   i. failed to provide the required notice of meeting and failed to call a meeting of the Association and Master Association;

   ii. failed to provide the required agenda to the Unit Owners;

   iii. failed to provide the required discussion at a public meeting of the Association and Master Association and vote of unit owners regarding the lease and new businesses;

   iv. failed to obtain the required vote and approval of the Unit Owners at a duly called meeting of the Master Association and Association regarding entering into the Lease, which is not condominium property within the meaning of Fla. Stat. § 718.103(13), and placing the individual units owners' units at financial risk to pay the lease amount of $7,500,000.00 ;

   v. materially altered and made substantial additions to the common elements without the required vote of Unit Owners; and

   vi. entered into leases and possessory or use interests in lands without the required vote of the Unit Owners.

53.     At the same time, <u>Defendant Board Members agreed to give a rebate of all assessments to Ocean Walk, its straw entities, CU 100 LLC CU 200 LLC and the successor owners of the commercial units, without giving the other Residential Unit Owners a proportionate 41% rebate of their special assessments</u>. **This flagrantly violates Fla. Stat. § 718.110(4),** which

provides, for obvious reasons, that one condominium unit owner cannot be given a break in assessments without giving other condominium unit owners a similar proportionate break. (See last two pages of Exhibit E hereto). This also violated Section 25.09 of the Declaration of the Master Association, which effectively incorporates Fla. Stat. § 718.110(4), by specifically prohibiting a unit owner from being excused from paying assessments unless all unit owners are proportionately excused from payment. Once again, Defendant Board Members did not care, as the exclusive break in assessments given to Defendant Ocean Walk, and its straw entity, CU 100 LLC and CU 200 LLC, was part of their fraudulent conspiracy, and furthered the

goal of causing financial distress to Residential Unit Owners. Moreover, the granting of a secret rebate to Ocean Walk and its shell entities is even more egregious considering they are owned by a New York billionaire and the owners of the residential units are generally not wealthy.

54.     Defendant Board Members then unlawfully diverted approximately $300,000.00 in insurance refunds to pay for the start-up of their new bar/restaurant and hotel business.

55.     Almost immediately after opening, the new bar/restaurant business and hotel rental businesses were financially failing, and in early 2013, Defendant Board Members began illegally misappropriating money from designated reserve funds to prop up these failing businesses, which was something they had previously done for other non-reserve expenditures. Pursuant to Fla. Stat. § 718.112, designated reserve funds cannot be used for anything other than the designated expense items absent a vote by unit owners. Despite the fact that the expenditures  of the bar/restaurant and hotel rental businesses were not  designated reserve items, the Defendant Board Members never sought the vote of the unit owners to use the reserve funds because such a vote would reveal, in part, the financial crisis and fraud being perpetrated. As discussed below, in order to further

conceal the misappropriation of reserve funds, the Defendant Board Members also created false and misleading entries in the accounting records of Both Associations.

56.   On June 13, 2013, in furtherance of the fraud, Defendant Board Members caused a lawsuit to be filed by the Association against Commercial Unit 200 for the unpaid assessments, claiming that it was owed $1,280,795.60, for unpaid assessments, plus interest at a rate of 18% per annum and attorney's fees and costs. Notably, said lawsuit failed to name Ocean Walk as a party-defendant, despite the fact that any competent foreclosure attorney would have advised the Defendant Board Members to name the prior owner, as a prior owner is liable under Florida law for unpaid assessments accruing during its ownership, and in this case, Commercial Unit 200

had no assets and was uncollectible, and Ocean Walk was highly collectable.   Thus, this foreclosure was yet another continuation of the fraudulent scheme and conspiracy, whereby Ocean Walk agreed to remove the current tenant from the Bar/Pool Property and front desk office area, and lease the same to Both Associations, in return for Ocean Walk avoiding its liability for unpaid assessments.

57.   Thereafter, in yet another "closed door deal" and in furtherance of the fraudulent conspiracy, Commercial Unit 200 was transferred to Defendant Ocean Hollywood Beach Development, LLC, on or about November 5, 2013, and the Association's aforesaid lawsuit was dismissed by the Association with prejudice on November 14, 2013. Notably, the money received by Both Associations from the sale left a shortfall in excess of $500,000.00 as to the delinquent assessments owed by Ocean Walk and CU 200 LLC, thereby furthering the goal of financially harming Both Associations and individual Residential Unit Owners. Although Ocean Walk, CU 200 LLC and the new owner, Defendant Ocean Hollywood Beach Development, LLC, legally owe

this remaining delinquency, it has presumably been forgiven as part of the fraudulent conspiracy.

58. Defendant Andrew Fisher is the manager (and presumably an owner) of the new owner of Commercial Unit 200, Defendant Ocean Hollywood Beach Development, LLC, and he became a board member of Both Associations and their Treasurer in 2014.

59.   Thereafter, the Defendant Board Members, including Fisher, voted and approved a budget for Both Associations, which passed on the expenses of the failing hotel rental business and failing bar/restaurant business to Both Associations, despite the fact that Residential Unit Owners never voting to approve the leases and businesses, and despite the fact that the Defendant Board Members had originally represented at the August 15, 2012 board meeting that

the expenses of the hotel rental program would be paid exclusively by the unit owners that participated in the program, and that the bar/restaurant business would support itself. Thus, besides committing a material misrepresentation to Residential Unit Owners, Defendant Board Members forced Residential Unit Owners to pay the expenses of the hotel rental program, even though they were not in the hotel rental program and did not share in the profits of that program. The purpose and result of the this new expense being placed on the backs of the Residential Unit Owners was to further the fraud by bankrupting Both Associations, diminish the value and economic viability of residential units, and force the Residential Unit Owners to sell their units.

60.   This latter goal is now being achieved, as Unit Owners are now selling their units in record numbers, and companies managed (and presumably owned in part) by Andrew Fisher have bought up dozens of residential units in 2014. Some of these units are being acquired by the Defendant Board Members rejecting the initial purchasers, and then assigning the right to purchase to Andrew Fisher's companies, in direct violation of his fiduciary duties as a board member and

the condominium documents, which preclude any such assignment to an existing owner. (see Section XV(A) of the Association condominium documents, Exhibit B hereto).

61.   Thus, Defendants Andrew Fisher and Ocean Hollywood Beach Development, LLC have joined in the conspiracy to defraud Plaintiff and other Residential Unit Owners, to bankrupt Both Associations and destroy the financial viability and value of residential units,  in order takeover of ownership of the Hollywood Beach Resort and individual residential units as part of a large development scheme being pursued by Andrew Fisher and his entities.

### THE FRAUDULENT COVER-UP OF THE INSOLVENCY AND FINANCIAL MISMANAGMENT AND FRAUD

62.  Both Associations are required by law to maintain a complete set of audited financial

statements in accordance with generally accepted accounting principles, and to provide each unit owner with a copy of same, pursuant to Fla. Stat. § 718.111.

63.   Defendant Board Members have intentionally failed to obtain and maintain audited financial statements, with the specific intent of further fraudulently conceal their secret leasehold deal and their related financial mismanagement, described below.

64.  Defendant Board Members further failed and refused to provide financial statements to Plaintiff's agent, despite demands for the same. This was done with the specific and deliberate intent to fraudulently cover-up the aforesaid unlawful activity and financial wrongdoing, described more fully below.

65.  In April 2013, after being denied the right to receive financial records, Plaintiff's agent then made formal written demand to inspect Both Association's records, including, but not limited to, financial records and board minutes. In response, the law firm representing Both Associations,

represented in a letter that the Master Association refused to make the records available for inspection, simply because the demand for inspection allegedly cited the wrong statutory section. According to said letter, the demand cited Fla. Stat. § 718.111, and "the Association is not governed by Chapter 718, Florida Statutes." (see letter, Exhibit F hereto). Notwithstanding the fact that a unit owner is not required to cite the law as a prerequisite to inspecting condominium records, said contention was false, as the request sought records from <u>both</u> the Master Association and the Association, and specifically cited Chapter 718 as to the Condo Association and Chapter 720 as to the Master Association. (See Exhibit F). Once again, this denial of the request to inspect records was yet another attempt to delay the discovery of the fraud.

66.  Moreover, the law firm that represented Both Associations in wrongfully denying

Plaintiff's agent the right to inspect the records, is the same law firm that represented Ocean Walk and CU 200 LLC in the lien foreclosure lawsuit discussed in paragraphs 56 and 57 above; the same law firm that is presently the registered agent for Commercial Unit 100, Commercial Unit 200 LLC and Both Associations; and the same law firm that prepared the deeds allowing Commercial Unit 100 and Commercial Unit 200 to be transferred by Ocean Walk Mall to affiliate entities for $100.00, when there was a massive debt owed by Ocean Walk Mall to Both Associations.

67.  After months of delay tactics by Defendant Board Members and their law firm, Plaintiff's agent was eventually allowed to inspect some of the records, which it had requested to inspect.

68.  The aforesaid inspection revealed why Defendant Board Members had stonewalled and refused to provide requested records to Plaintiff's agent, as they reveal the following accounting fraud and misappropriation of money by Defendant Board Members:

i.  The Master Association had misappropriated designated reserve funds for non-reserve expenditures without obtaining the required approval of the majority of the unit owners, in violation of Fla. Stat. § 718.112. (See Exhibit G).

ii. The balance sheet had a line item that indicated that there was $1,188,080.26 in the reserve account. This was a complete fabrication.  To create this fictitious reserve entry, the balance sheet had a line item for the reserve funds that stated that $1,124,852.26 was "due from Operating to Reserve." (See Exhibit G). However, a cursory review regarding the amount of operating cash on the same balance sheet reveals that there was no money in operating and that operating actually had a negative balance of $855,560.53. (See Exhibit G). Thus, in reality, not only was the reserve fund lacking over one million dollars, there was no money in operating to repay the misappropriated reserve funds.

iii. Thus, these entries constitute intentional fraudulent misrepresentations by Defendant Board Members.

iii. The creation of this fictitious "due to/due from" was also intended to fraudulently conceal the insolvency of Both Associations and misappropriation of the reserve funds.

69.   The management company retained by Defendant Board Members, KW Property Management, admitted to the impropriety of this accounting practice, and specifically noted on the balance sheet:

> **"Note: The Balance Sheet Reflects a "Due to Reserves." Management understands the Association may be in violation of Florida Statutes and its approved budget; hence we recommend the Board take appropriate corrective measures to address this issue in0 a prompt manner."** (See Exhibit G).

70.   Thus, the Defendant Board Members had entered into a lease for 7.5 million dollars while Both Associations were essentially insolvent, and Defendant Board Members fraudulently concealed the insolvency and misuse for reserve funds by engaging in accounting practices that were improper, deceptive and fraudulent and violated generally accepted accounting practices, all of which was part of their scheme to bankrupt Both Associations, diminish the values of residential

21

units and force their sale.

71.   Plaintiff has not obtained updated financials since 2012, because Defendant Board Members have again refused to provide the same despite being requested, in further violation of Fla. Stat. §718.111(12)(b) & (c), which require all association official records to be made available for inspection by unit owners, and in furtherance of the fraudulent concealment.

72.   As of August 1, 2013, Defendant Board members were also engaging in a set-off scheme to further conceal their fraud, whereby the monthly rent of $49,526.30 under the lease was being set-off against monthly maintenance and the monthly special assessment rebates granted to the new owner of the commercial space, resulting in a deficit amount owed by the Master Association to the landlord in the amount of $20,071.75. (See Exhibit H hereto).

73.  To further carry out their fraudulent scheme, since 2011, Defendant Board members have also intentionally failed to properly maintain the common areas and limited common areas of the Hollywood Beach Resort and allowed them to materially deteriorate to such a magnitude that the property is unsanitary, decrepit and run down in appearance; and escalators, elevators and the outside staircase that provides ingress and egress are nonfunctional. The magnitude of the disrepair was so flagrant that a Special Master was appointed, in part, to address the problems.

## STANDING

74.   Fla. Stat. § 718.303 provides, *inter alia*,  that: "Each unit owner, each tenant and other invitee, and each association is governed by, and must comply with the provisions of, this chapter, the declaration, the documents creating the association, and the association bylaws which shall be deemed expressly incorporated into any lease of a unit. Actions for damages or for injunctive relief, or both, for failure to comply with these provisions may be brought by the association or by

a unit owner against: (a) The association (b) A unit owner (c) Directors designated by the developer, for actions taken by them before control of the association is assumed by unit owners other than the developer (d) Any director who willfully and knowingly fails to comply with these provisions (e) Any tenant leasing a unit, and any other invitee occupying a unit." A similar provision exists for timeshares at Fla. Stat. § 721.12(3).

75.     Pursuant to Fla. Stat. §718.1255, certain actions against condominium associations and board members must first participate in non-binding arbitration before filing a lawsuit. On June 14, 2014, Plaintiff filed a Petition For Mandatory Non-Binding Arbitration ("Petition") with the State of Florida, Department of Business Regulation, Division of Condominiums. Timeshares and Mobile Homes ("State"), and simultaneously filed a motion to

permanently abate the arbitration and allow the dispute to proceed to a lawsuit. On July 11, 2014, the State issued a Final Order, which granted the motion to abate, in *toto*, and dismissed the Petition for lack of jurisdiction and stated that "petitioner may seek relief in a court of competent jurisdiction. (see Exhibit I, attached hereto).

## COUNT I
## CIVIL RICO – MAIL AND WIRE FRAUD

76.   Plaintiff re-alleges and incorporates paragraphs 1 through 75, as if fully set forth herein.

### A. Mail and Wire Fraud.

77.   18 USC §1341, "Frauds and Swindles" provides that it is a violation of the statute to use the mail to commit fraud.

78.   The Wire Fraud Statute, 18 USC §1343 "Fraud by Wire, Radio or Television," provides that it is a violation of the statute if anyone transmits or causes to be transmitted by means of

wire (which includes telephone or internet) any communication for the purpose of executing a scheme or artifice to defraud.

79.     Defendant Board Members devised the aforesaid scheme with the specific intent to defraud Plaintiff and other Residential Unit Owners to deprive them of their property (their units) and their money (the value of their units, the illegal assessments they were required to pay attributable to not receiving a proportionate assessment rebate, the money wasted on the two new businesses, the passing of those business expenses on to Residential Unit Owners, and the misappropriation).

80.     At the time Defendant Board Members devised their fraudulent scheme, there is no question that they reasonably foresaw and intended to use interstate mails and wires to perpetrate

their fraudulent scheme, as they needed to communicate from a practical and legal standpoint, certain false information via mails and wires to the Residential Unit Owners who do not live at the Hollywood Beach resort and permanently reside all over the United States and World; and they needed to use the wires (including the internet) to form the shell entity, HHBR.

81.  Defendant Board Members actually used the interstate mail and wires to further their fraud, including, but not limited to, the following:

     a) On or about November 22, 2010, as part of their scheme to defraud, Defendant Board Members sent a letter via facsimile across state lines to Plaintiff's agent and via mail to the Residential Unit Owners, which falsely represented that there was evidence that the company managing Both Associations had breached fiduciary duties and was therefore fired. Said misrepresentation was false and was intended to influence Residential Unit Owners not to question the replacement of the management company, which Defendant Board Members needed out of the way in order to conceal their scheme to defraud. Said misrepresentation was further made to influence Residential Board Members to vote for them at the upcoming December 2010 board elections. Notably, said letter mentions that a forensic accounting is being

hired regarding the alleged wrongdoing. (See Exhibit J).

b) On July 6, 2011, as part of their scheme to defraud, the Defendant Board Members sent a letter via the mail across state lines to Plaintiff's agent and other Residential Unit Owners, which contained multiple misrepresentations, including, but not limited to: that the prior management company had removed Both Associations' records and refused to provide them to Defendant Board Members and was otherwise uncooperative and antagonistic; that the forensic accounting, mentioned in the December 10, 2010 letter, had been completed, and even though the investigation by the State of Florida and an independent auditor found absolutely no wrongdoing by the prior management company, they were nevertheless unreliable and not accurate; and that the hotel rental program should be run by an independent third party company (which contradicts their later actions in setting up HHBR to run the program). (see Exhibit K).

c) On or about September 13, 2012, as part of their scheme to defraud, Defendant Board Members law firm, acting as agents for Defendant Board Members, used the wires to create HHBR, which was formed as an integral part of the scheme to conceal the aforesaid fraud.

d) On or about June 19, 2013, as part of their scheme to defraud,


Defendant Board Members law firm, acting as agents for Defendant Board Members, mailed the aforesaid letter, (Exhibit F) to Plaintiff's agent, which refused to allow Plaintiff's agent to inspect the records of Both Associations. Said letter of refusal violated Fla. Stat. §718.111(12)(b) & (c) and contained false statements that the  inspection was being denied due to alleged failure to cite the correct statute, with the specific intent of delaying inspection of the records in order to conceal the aforesaid fraud.

e) On November 19, 2013, as part of their scheme to defraud, Defendant Board Members encouraged and caused a letter to be mailed across state lines by one Uri Fried, who was Defendant Board Members agent and described "liaison to the unit owners," which contained multiple misrepresentations and omissions of material fact, including, but not limited to: that the sale of Commercial Unit 200 enhances the finances of Both Associations and gets them out of a financial hole. (see Exhibit L). Said letter further states that the sale of Commercial Unit 200 "begins the process of a grand redevelopment," which is the object of the scheme to defraud, although most of the Residential Unit Owners are unaware that the "grand development" involves them selling their units for a cheap, bargain basement price.

f) On December 12, 2013, as part of their scheme to defraud, Defendant Board Members encouraged and caused a letter to be mailed across state lines by one Uri Fried, who was Defendant Board Members agent and described "liaison to the unit owners," which contained multiple misrepresentations and omissions

of material fact, including that Defendant Board Members had brought Both Associations back to solvency and sound finances; and that the sale of Commercial Unit 200 put $800,000.00 into the "coffers" of Both Associations without mentioning that the delinquency was much greater and remained unpaid or the fraudulent conveyances. However, Freid turned on Defendant board Member Jekic in the letter, and suggested that other Defendant Board Members be elected but not Jekic, for among other things, Jekic's refusal to provide Residential Unit Owners financial records regarding the bar/restaurant, which was losing money. (see Exhibit M).

g) On or about November/December, 2013, as part of their scheme to defraud, Defendant Board Members, including Fisher, caused Jekic to mail a letter across state lines to Plaintiff's agent and other Residential Board Members, which contained multiple misrepresentations and omissions of material fact, including, but not limited to: that the purchasers of Commercial Unit 200 will add value to the Residential Unit Owners, and that the finances of Both Associations have dramatically improved; that the hotel rental business made money for those who enlisted in the rental program and bar/restaurant business made money; without mentioning the misappropriation of reserve funds or that the bar and hotel business were losing so much money that Defendant Board Members were planning on placing the expenses of those two businesses in the budgets of Both Associations. (see Exhibit N).

h) On or about May 15, 2014, as part of their scheme to defraud, Defendant Board Members, including Fisher, caused Jekic to mail a letter across state lines to Plaintiff's agent and other Residential Board Members, which contained multiple misrepresentations and omissions of material fact, including, but not limited to: that the prior management company from 2008-2010, had embezzled or misappropriated 41,200,000.00 of assessments, which was proven to be totally without merit by the independent auditor and the State of Florida; that the expenses were being increased due to costs of living and repair issues, without mentioning that in excess of $266,000.00 was being placed in the budget for rent owed under the illegal lease. Said letter also attached a copy of a proposed new budget. Notably, it passes the rent payments on to the Residential Unit Owners as an expense  relating to the hotel rental business and bar/restaurant business, but there is no line item showing that they get the income from those businesses. Thus, the Residential Unit Owners are stuck with the burden, but not any benefit – more evidence of the intent to destroy them financially. (See Exhibit O).

82.  Plaintiff relied on many of the aforesaid representations by Defendant Board Members

and was deceived into believing that they were true.

**B. The RICO Enterprises.**

83.    The Master Association and Association are enterprises within the meaning of 18 U.S.C. §1961(4) (hereinafter, the "Enterprises").

**C. Interstate Commerce**

84.  The aforesaid Enterprises effect interstate commerce by directly engaging in the production, distribution, and/or acquisitions of goods and services in interstate commerce, which includes, but is not limited to, the fact that they buy goods through interstate commerce; they advertise, provide and distribute goods and services (including travel and hotel services) to be persons from around the World. Further, the predicate acts, described below, affect interstate commerce, as they were committed by sending mail and facsimiles across state and international borders.

**D. The RICO Enterprises.**

85.    The Master Association and Association are enterprises within the meaning of 18 U.S.C. §1961(4) (hereinafter, the "Enterprises").

**E. Conspiracy**

86.  As alleged above, Defendant Board Members entered into a conspiracy with Ocean Walk Mall, CU100 LLC and CU200 LLC, which was later joined by Andrew Fisher, Ocean Hollywood Beach Development, LLC, and his entities. All Defendants intended to facilitate and agreed to facilitate the operation of the Enterprises though the pattern of racketeering activity, and all Defendants engaged in actual conduct, described above, that furthered the endeavor of the conspiracy to defraud Plaintiff and

other Residential Unit Owners through a pattern of racketeering activity. As a result, Defendants

are jointly and severally liable to Plaintiff for its damages sustained as a direct and proximate result of the RICO violations, alleged below.

### F. Pattern of Racketeering.

87.   Defendants have engaged in a pattern of racketeering, as evidenced in part, by the aforesaid predicate acts, which are all related and continuous beginning in 2010 to present. They are related in that they all involved the same purpose (defraud Plaintiff and other Residential Unit Owners, bankrupt the Both Associations, diminish the financial value and viability of residential units to force their sale); the same results (the financial destruction of Both Associations and diminution of the economic value and viability of their units); the same participants (Defendants and their agents) and the same victims (Residential Unit Owners). Moreover, the pattern of racketeering is "open-ended," in that by its nature it will project into the future and repeat itself, evident in part, by the re-election of Defendant Board Members and the

addition of new board member, Andrew Fisher, and his latest efforts to acquire residential units.

### G. Culpable Persons

88.   Defendants Michael Jekic, Laura Welliver, Christina Morello, Maria Mejido, Judy Buchan, Andrew Fisher, Ocean Hollywood Beach Development, LLC, Ocean Walk Mall, CU100 LLC and CU200 LLC are "culpable persons" who acted intentionally, willfully in committing the aforesaid acts, which they knew were unlawful and a violation of the law. Defendants John Does 1-10 and Jane Does 1-10 are "culpable persons" who likewise acted intentionally, willfully in committing the aforesaid acts, which they knew were unlawful and a violation of the law, but whose identities are unknown at the present time despite due diligence being conducted to ascertain same.

### H. RICO Violations

89.  18 USC §1964(c) provides a private right of action for mandatory treble damages, costs and attorney's fees to "any person injured in his business or property by reason of a violation of §1962(c) which makes it "unlawful for any person employed by or associated with" a RICO enterprise "to conduct or participate . . . in the conduct of such enterprises affairs through a pattern of racketeering activity" including "mail fraud and wire fraud." Mail fraud, 18 USC 1341, and wire fraud, §1343, prohibit the use of the mails or any interstate wire transmission for the purpose of implementing a scheme to defraud for the purpose of obtaining money.

90.  Defendants individually and in conspiracy with one another, conspired to, and did violate 18 USC §1962(c), by operating, conducting and participating in both RICO Enterprises' affairs through a pattern of racketeering activity impacting interstate commerce and for the unlawful purpose of defrauding Plaintiff, and 2000 plus other victims out of money and

property by means of mail and wire fraud as alleged above.

91.  Defendants violated 18 USC §1962(d) by conspiring, as alleged herein, to violate 18 USC §1962(c).

92.  As a direct and proximate result of said racketeering activities and violations of 18 USC §1962(c) & (d), Plaintiff has been damaged, which include, but are not limited to, the fact that it has paid money to Both Associations which has been misappropriated as aforesaid; its residential unit has diminished in value and economic viability; the common elements of Hollywood Beach Resort have fallen into a state of disrepair and have been damaged; and the finances of Both Associations have been wrongfully depleted pursuant to mismanagement and the unlawful lease and bar/restaurant and hotel rental businesses.

93.   Plaintiff is entitled to recover mandatory treble damages, costs and attorney's fees under 18 USC §1964(c).  This Court should also order appropriate relief under 18 USC §1964(a), including, but not limited to, ordering the appointment of a receiver to take control of Both Associations; ordering a complete accounting and audit of Both Associations; ordering all current Board Members and Fisher to resign as board members;  unwinding and voiding of the sales of Commercial Unit 100 and Commercial Unit 200; and the unwinding and voiding of all sales of residential units to Andrew Fisher or any entity in which he has an ownership interest or in which he facilitated the purchase of units.

**Wherefore**, Plaintiff requests judgment against Defendants, jointly and severally, as follows:

A.  Awarding Plaintiff compensatory damages;

B.  Awarding Plaintiff treble damages;

C.  Awarding Plaintiff attorney's fees and  costs;

D.  Appointing  a receiver over Both Associations;

E.   Ordering an accounting and complete audit of Both Associations;

F.  Ordering the resignation  and removal of all current board members of Both Associations;

F. Unwinding and voiding the sales of Commercial Unit 100, Commercial Unit 200, and any and all units purchased by Andrew Fisher or any entity in which he has an ownership interest or in which he facilitated the purchase of units;

G. Entering judgment against Ocean Walk, CU 200 LLC and Ocean Hollywood Beach Development, LLC, for the total amount of the unpaid delinquent assessments and for the total amount not paid due to the illegal rebate, to be refunded to Both Associations and refunded proportionately to the Residential Unit Owners (excluding Defendants), and ordering them to pay the full amount of all assessments in the future without a rebate; and

H. Such other relief as is just and proper.

## COUNT II
## BREACH OF FIDUCIARY DUTIES

94. Plaintiff re-alleges and incorporates paragraphs 1 through 75, as if fully set forth herein.

95. Pursuant to Fla. Stat. §718.11(1)(a), the board of directors, directors and officers of the Master Association owed a fiduciary duty to the unit owners, including Plaintiff.

96. Pursuant to Fla. Stat. §718.11(d), as required by s. 617.0830, the directors and officers of the Master Association had a duty to discharge his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the interests of the association. The directors had a similar fiduciary duty under Fla. Stat. §721.13.

97. Defendant Board Members violated the Florida Condominium Act, specifically, Fla.

Stat. §'s 718.110, 718.111, 718.112, 718.113, 718.114, 721.13, and 721.15, the Declaration of Condominium and the By-Laws, as follows:

    i.     by failing to provide the required notice of meeting and failed to call a meeting of the Association and Master Association;

    ii.     by failing to provide the required agenda to the Unit Owners;

    iii.     by failing to provide the required discussion at a public meeting of the Association and Master Association, or allow unit owners to vote on the new businesses;

    iv.     by failing to obtain the required vote and approval of the Unit Owners at a duly called meeting of the Master Association and Association regarding entering into the Lease, which is not condominium property within the meaning of Fla. Stat. § 718.103(13), and placing the individual units owners' units at financial risk regarding the lease amount of $7,500,000.00;

    v.     by materially altering and making substantial additions to the common elements

31

without the required vote of Unit Owners;

vi.      by agreeing in the Lease to give a rebate in condominium assessments to Ocean Walk, and its straw entities, CU 100 LLC and CU 200 LLC, and future owners of Commercial Unit 100 and Commercial Unit 200, without giving the other unit owners a 41% rebate of their special assessments.

vii.  by diverting approximately $300,000.00 in insurance refunds to pay for the start-up of their new bar/restaurant and hotel business;

viii.    by creating and using HHBR, to be operated as part of a Florida condominium association, which is not a corporation;

ix. by failing to maintain a complete set of audited financial statements in accordance with generally accepted accounting principles, and by failing to provide each unit owner with a copy of same;

x. by failing and refusing to provide financial statements, board minutes and other condominium records to Plaintiff's Agent, despite demand for the same;

xi. by using designated reserve funds for non-reserve expenditures without obtaining the required approval of the majority of the unit owners;

xii. by not maintaining financial records in accordance with generally accepted accounting principles and by using the entry of the bogus, improper "due from" and "due to" entry;

xiii. by allowing the sale and transfer of Commercial Unit100 and Commercial Unit 200, and by not timely pursuing collection of the delinquent assessment owed by Ocean Walk; and

ixx. by not maintaining and repairing the common elements and limited common elements and allowing them to fall into a state of disrepair.

98.  Defendant Board Members and Fisher violated the law and their fiduciary duties by

passing a budget in 2014, which passed the expenses of the hotel rental business and

bar/restaurant business onto Plaintiff and the Residential Unit Owners, and by allowing Andrew

Fisher and his entities to buy-up residential units as aforesaid.

99.  Defendant Board Members intentionally, willingly and knowingly failed to comply with

the Florida Condominium Act, specifically, Fla. Stat. §'s 718.110, 718.111, 718.112, 718.113,

718.114, the Declaration of Condominium and the By-Laws, by acting and failing to act as aforesaid.

100.  Pursuant to Fla. Stat. 718.11(d), the board of directors, directors and officers of the Master Association are liable for monetary damages as provided in s. 617.0834 if such officer, director, or agent breached or failed to perform his or her duties and the breach of, or failure to perform, his or her duties constitutes a violation of criminal law as provided in s. 617.0834; constitutes a transaction from which the officer or director derived an improper personal benefit, either directly or indirectly; or constitutes recklessness or an act or omission that was in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

101.  The aforesaid actions and inactions by the Defendant Board Members and Fisher, was intentional, reckless, in bad faith, with malicious purpose, and exhibiting wanton and willful disregard of human rights, safety, or property, and constituted a breach of their fiduciary duties.

Further, the Defendant Board Members and Fisher had a specific intent to injure Plaintiff, and in fact injured Plaintiff as aforesaid.

102.  As a direct and proximate cause of the aforesaid breaches of fiduciary duties, Plaintiff suffered damages.

103.  Pursuant to Fla. Stat. 718.303(1) and the condominium documents (Exhibits A & B), Plaintiff is entitled to an award of reasonable attorney's fees.

**Wherefore**, Plaintiff requests judgment against Defendant Board Members and Andrew Fisher, jointly and severally, as follows:

A.  Awarding Plaintiff compensatory damages;

B.  Awarding Plaintiff attorney's fees and costs;

C.  Appointing  a receiver over Both Associations;

D.   Ordering an accounting and complete audit of Both Associations;

E.  Entering judgment against Ocean Walk, CU 200 LLC and Ocean Hollywood Beach
    Development, LLC, for the total amount of the unpaid delinquent assessments and for
    the total amount not paid due to the illegal rebate, to be refunded to Both Associations
    and refunded proportionately to the Residential Unit Owners (excluding Defendants) ,
    and ordering them to pay the full amount of all assessments in the future without a
    rebate;

F.  Unwinding and voiding the sales of Commercial Unit 100, Commercial Unit 200,  and
    any and all units purchased by Andrew Fisher or any entity in which he has an
    ownership interest or in which he facilitated the purchase of units; and

G.  Such other relief as is just and proper.

### Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

FOREMAN FRIEDMAN, P.A.
BY: /s/Gregory R. Elder, Esq.
Gregory R. Elder, Esq.
Florida Bar No. 54006
One Biscayne Tower, Suite 2300
2 South Biscayne Boulevard
Miami, FL  33131
Phone: 305-358-6555
Fax: 305-374-9077
Attorneys for Plaintiff